**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0712n.06

**No. 09-2077**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Nov 17, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| MARY ANN GASCHO, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| SCHEURER HOSPITAL, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | |

Before: MERRITT, ROGERS and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. Mary Ann Gascho signed an agreement releasing her Title VII

claims against Scheurer Hospital, her former employer. She now argues that the agreement is

unenforceable because she executed it under duress. The district court entered summary judgment

against her, and because she has not supported her claims with evidence from which a reasonable

jury could conclude that the agreement was invalid, we affirm.

I.

In 1972, Mary Ann Gascho began working as a registered nurse for Scheurer Hospital, near

the shoreline of Lake Huron and Saginaw Bay. For the last eighteen years of her employment at the

hospital, she was married to the hospital's President and CEO, Dwight Gascho.

In the summer or autumn of 2006, Gascho suspected that her husband was having an affair with Ms. Rabideau, a vice president at the hospital. At that same time, Mr. Gascho grew physically violent with Gascho. In early November, he kicked her in bed because she was "snoring like a cow." R.44-3 at 52. Later, on the night of November 10, Mr. Gascho allegedly raped his wife after she refused to have sex with him, an incident that caused her to suffer a split lip. The following day, Gascho asked her husband whether he and Ms. Rabideau were having an affair, and he acknowledged the infidelity.

On January 17, 2007, after Mr. Gascho told his wife he was seeking a divorce, she went to see Ms. Rabideau. Gascho sarcastically congratulated Ms. Rabideau, reported that her children called Ms. Rabideau "the whore next door" and berated her in other ways. R.44-3 at 53–54. Mr. Gascho, who witnessed the confrontation, asked Gascho to join him in his office. She refused and, after further prodding, refused again. Mr. Gascho grabbed her around the shoulders and dragged her into his office, causing bruises on her back and scratches on her back, arms and wrists.

Once Mr. Gascho had pulled Gascho into his office, he fired her. Two days later, after Gascho revealed her injuries to Lee Gascho, a hospital employee and relative of Dwight Gascho, as well as to the hospital's Human Resources Director Grey Foy, the hospital converted the discharge into a three-day suspension. When the suspension ended, the hospital allowed Gascho to take mental health leave under the Family and Medical Leave Act.

In February 2007, the husband told Gascho that the hospital was going to offer her a separation agreement. Foy and Lee Gascho drove to Gascho's house to present her with the agreement. The agreement gave her a year's salary and other benefits in return for her voluntary resignation and release of claims, including Title VII claims, against the hospital. Foy explained the separation agreement to Gascho, summarizing its key provisions. Foy recommended that she hire a labor-law attorney to review the document and told her that she would have twenty-one days to sign the agreement and seven days to change her mind if she did sign it. Foy also told her to "sue [Mr. Gascho] for everything he's worth." R.44-3 at 12.

Neither her husband nor anyone from the hospital threatened physical harm to Gascho between the day she was fired and the day she signed the agreement. Nor were there any other incidents of physical violence during this time.

During this time, however, Gascho had several conversations with Mr. Gascho and felt intimidated by some of them. At one point, he warned her that, if she failed to sign the agreement, "he would be the worst enemy [she] could ever imagine. The hospital has deep pockets and we always win." R.40-1 at 32. He promised to "destroy [her] life" if she did not sign it and told her that he was "willing to ruin [other people's] lives" if he lost his job over the incident. R.40-1 at 51. At other times, apparently trying to coax her into signing the agreement, he said "you need to sign it, at least it gives you insurance," and the agreement was "only a retirement package and we do it all the time." R.44-3 at 29, 31, 48; R.40-1 at 26, 49. At still other times, he lashed out at her, calling her "crazy" and "confused," and insisting that "I am in control!" R.44-3 at 57; R.44-4 at 24–26.

Gascho saw a psychiatrist and took antidepressants as well as Lunesta, Ambien, Benadryl and Ultram, all to help her sleep. She experienced "mental anguish" at her husband's "betray[al]." R.44-3 at 19. While she had worked her way to a management position at Scheurer Hospital, she feared she would be unable to obtain an equivalent position elsewhere. She had $11,000 in the bank and worried about how long that would sustain her.

Gascho sought advice from several sources about whether to sign the agreement. She showed the agreement to her divorce lawyer, but the lawyer declined to review it because she was not a labor attorney. She spoke with her three children about it, and they all told her to sign it. She also talked with friends about the agreement.

On February 28, 2007, she called her husband and told him that she was ready to sign the agreement. He brought a copy of the agreement to her home, where they had a "civil" meeting and she signed it. R.40-1 at 45.

About a year later, Gascho filed this action in federal court seeking to rescind the settlement agreement and seeking money damages against the hospital under Title VII and Michigan law. The court dismissed her state law claims, a determination she does not appeal, then rejected her Title VII claim as a matter of law, concluding that she had voluntarily and knowingly signed the settlement agreement and thus could not rescind it on duress grounds.

II.

Gascho presents two questions on appeal: May she rescind the settlement on the ground that duress prevented her from voluntarily and knowingly signing it? And did the district court abuse its discretion in denying her motion to compel discovery?

A.

In addressing the duress ruling, we build from the ground floor. We give fresh review to the district court's summary judgment ruling and draw all factual inferences in favor of Gascho, the party opposing summary judgment. *Reese v. CNH Am. LLC*, 574 F.3d 315, 321 (6th Cir. 2009); Fed. R. Civ. P. 56(c)(2). The parties and the district court have assumed that an effort to rescind a settlement agreement presents a question of fact for a jury, and so have we. "Federal law controls the validity of a release of a federal cause of action." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1481 (6th Cir. 1990). And a "totality of the circumstances" test determines whether an employee has "knowingly and voluntarily executed" a release of her Title VII claims and thus may not rescind it on duress grounds. *Adams v. Philip Morris, Inc.*, 67 F.3d 580, 583 (6th Cir. 1995). The test calls on us to examine "(1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances." *Id.*

*Gascho's experience, background and education.* Nothing about Gascho's history suggests that the agreement was beyond her—that she did not have the capacity or background to grasp its meaning. Even without a bachelor's degree, she took post-graduate courses to become a registered nurse, and she held her nursing job for more than thirty years, eventually entering the ranks of management. It is fair to conclude that an experienced nurse, with her training and background, could comprehend the meaning and effect of a settlement agreement.

In considering this factor, Gascho urges us to consider "her history, marital status and interaction with Dwight Gascho." Gascho Br. at 13. But the inquiry regarding this factor goes not to "experience" or "background" in the abstract but to the claimant's "education and business experience." *Riley v. Am. Family Mut. Ins. Co.*, 881 F.2d 368, 372 (7th Cir. 1989); *see Bormann v. AT&T Commc'ns, Inc.*, 875 F.2d 399, 403 (2d Cir. 1989); *Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 523 (3d Cir. 1988). Gascho's marital history no doubt affects the ultimate analysis, but it does not bear on this factor.

*Time to consider the waiver and opportunity to consult an attorney.* The hospital gave Gascho twenty-one days to review the agreement and seven days to change her mind after signing it. These timelines gave her ample opportunity to consider the agreement and spared her the risk of not having enough time to consider the pros and cons of signing it. Our cases say as much. *See Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 668 (6th Cir. 2003) (agreement enforceable when employee had three days to withdraw her consent after signing it); *Adams*, 67 F.3d at 582

(agreement enforceable when employee had five days to consider whether to waive Title VII and ADEA claims).

A related federal statute suggests a similar conclusion. While Title VII does not contain a waiver-of-claims provision, the Age Discrimination in Employment Act does. It says that, to establish a knowing and voluntary waiver of claims under the Act, the individual must be "given a period of at least 21 days within which to consider the agreement" and a seven-day revocation period after signing it. 29 U.S.C. § 626(f)(1). This congressional policy in a related civil rights statute bolsters the conclusion that a twenty-one-day consideration period and a seven-day reconsideration period suffices to establish a legitimate waiver.

These timelines also gave Gascho ample opportunities to seek an attorney's advice. She did just that, though for reasons of her own she chose only to ask a divorce attorney, not a labor-law attorney, even after the hospital (through Greg Foy) recommended she consult a specialist in the area. The question at any rate goes to the amount of time given to sign the agreement, not to whether the claimant properly used the time to speak to the right kind of attorney.

*The clarity of the waiver.* The terms of the agreement leave no room for doubt about its meaning. It "releases and forever discharges [Scheurer] Hospital . . . from any and all claims of any nature . . . based on any fact, circumstance or event occurring or existing at or before [Ms. Gascho's] execution of this Agreement. [It] includes all claims whatsoever . . . including . . . claims under . . . Title VII of the Civil Rights Act of 1964." R.26 Ex. 1 at 2–3. One does not need a law

degree to grasp the import of these terms. By signing the agreement and accepting the benefits offered to her, Gascho would lose any Title VII claims she had against the hospital.

*Consideration for the waiver.* In return for Gascho's release of any claims against the hospital, her voluntary resignation and her promises of confidentiality, the hospital offered: a severance payment in the form of a year's salary ($41,234.96), eighteen months of health insurance premium payments (roughly $9,900), and payment for her accrued vacation ($151.47). Gascho does not argue that this consideration was unfair or otherwise a disproportionate exchange of value and indeed nowhere challenges the fairness of the benefits the hospital offered her.

*Other relevant circumstances.* To the extent Gascho has any chance of success on this claim, it does not come from the first four considerations, which all cut strongly against her. The knowing-and-voluntary inquiry is a totality-of-circumstances test, however, and it allows claimants to invoke other considerations, including the risk that the waiver was a product of duress and thus involuntary. *Adams*, 67 F.3d at 583; *see Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1229 (10th Cir. 1999) (same rule for a release of ADEA claims). As a general matter, duress involves an unlawful or "wrongful act or threat" that overcomes the free will of the victim. *See Rissman v. Rissman*, 213 F.3d 381, 386 (7th Cir. 2000); *see also Happ v. Corning, Inc.*, 466 F.3d 41, 44 (1st Cir. 2006). Gascho's arguments on this score oscillate between two theories of duress: economic and physical.

Her economic-duress claim falls short because there was no improper or illegal fiscal threat. All bargaining, whether to buy a house, to take a job or to settle a dispute, comes with implicit

economic and psychological pressures—that if the one party does not take the offer, it may go to someone else in the case of the perfect house or the ideal job or it may not happen at all in the case of the money and other benefits accompanying a settlement offer. The better the offer, indeed, the greater the implied fiscal threat, creating the possibility that a claim of duress grows stronger the more generous the offer.

Yet that is not how it works. As the Restatement reminds us, "[a]n ordinary offer to make a contract commonly involves an implied threat by one party, the offeror, not to make the contract unless his terms are accepted by the other party, the offeree." Restatement (Second) of Contracts § 176 cmt. a (2010). That Gascho worried about having to file a lawsuit (and winning it) if she opted not to accept the settlement offer is precisely the kind of pressure anyone (not independently wealthy) would face in this context—the fear that if she chose to litigate her claims against the hospital she might not get any financial compensation at all. She did not need her former husband's explicit warnings to appreciate this implied reality. "No legal system can accept an assertion that 'this contract was signed under duress because my only alternative was a lawsuit.' That would eliminate settlement—and to a substantial degree the institution of contract itself." *Rissman*, 213 F.3d at 386; *see Happ*, 466 F.3d at 44.

Gascho's belief "that [she] had no choice" in signing the agreement, in view of the economic benefits offered and the risk of economic hardship if she declined the offer, does not by itself state a claim, R.40-1 at 43, because this kind of threat is "an accepted part of the bargaining process." Restatement (Second) of Contracts § 176 cmt. a. That is particularly so here, given that she makes

no argument that the settlement produced a disproportionate exchange of benefits. A contrary view, moreover, "would invalidate most, if not all, releases of claims in agreements conferring severance benefits on employees." *Dorn v. Gen. Motors Corp.*, 131 F. App'x 462, 468 (6th Cir. 2005); *see VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 123 (2d Cir. 2001) ("Because an element of economic duress is thus present when many contracts are formed or releases given, the ability of a party to disown his obligations under a contract or release on that basis is reserved for extreme and extraordinary cases."); *Rissman*, 213 F.3d at 386.

That leaves the possibility that her husband's physical abuse makes the agreement voidable. If Gascho's testimony is true, as we must assume in the context of reviewing a summary judgment decision, her husband is far from an admirable individual. It also is no doubt the case that physical and verbal threats during the bargaining process may rise to the level of coercion when they are "improper" and when the threat "leaves the victim no reasonable alternative." Restatement (Second) of Contracts §§ 175–76; *see Street*, 886 F.2d at 1482 & n.27; *Happ*, 466 F.3d at 44.

Viewed in a vacuum, the husband's misconduct might suggest that the duress claim should go to a jury. But three features of this case (along with the four other voluntariness inquiries) confirm that the district court fairly held as a matter of law that her decision to enter the settlement was voluntary.

First, the key objective of the settlement, and the only part of it Gascho challenges here, is the release of Gascho's *claims against the hospital*, not the release of any claims Gascho had against

her husband. The hospital played no role in the husband's physical misconduct, and of course had no reason to know about the incidents at home. The proposed settlement did not even exist when the husband abused Gascho, and indeed would not exist until a month later. By any standard, moreover, the hospital took reasonable measures once it learned about the Gaschos' problems through the encounter at the office over the husband's infidelity. When the husband precipitately fired Gascho, the hospital quickly converted the discharge into a three-day suspension. When the suspension ended, the hospital allowed Gascho to take mental-health leave under the Family Medical Leave Act. Within a month of this incident and within a month of learning about the Gaschos' fraying marriage, the hospital offered Gascho a settlement agreement that to this day she does not claim was unfair. And in the course of discussing the settlement agreement with Gascho, one hospital executive urged her to "sue [her husband] for everything he's worth." R.44-3 at 12. These are not the kinds of actions that might coerce an employee into entering a settlement.

Second, to the extent Gascho was abused by her husband, as opposed to the hospital, signing a settlement with the hospital was not her only reasonable alternative. Gascho had the right (and still may have the right) to file criminal charges against her husband, to sue him in tort, to extract a better divorce settlement from him, to obtain a restraining order against him or, as one hospital executive urged, to "sue [him] for everything he's worth." R.44-3 at 12. The parties have not told us the terms of the Gaschos' subsequent divorce agreement. So far as this record is concerned as a result, Gascho still may have the right to vindicate some or all of these claims to this day, and if not that is presumably because she was fairly compensated in the divorce proceeding. What she cannot do is

vitiate the terms of a settlement agreement with *the hospital*—the terms of which she has yet to challenge as unfair—on the ground that she had no reasonable choice in the matter in view of her *husband*'s misconduct. A reasonable alternative will defeat a claim of duress, and she had just that here: filing any or all of these actions against her husband. Restatement (Second) of Contracts § 175 cmt. b. While initiating litigation is not a reasonable alternative if the process "will not afford effective relief to one in the victim's circumstances," *id.*, that was not the case in this situation. The only thing Gascho complains about in this case is the opportunity to sue the hospital under Title VII, not forgone opportunities to sue her husband, who is plainly the key target of her complaint.

Third, the circumstances *after* the hospital offered her this settlement confirm that Gascho's will was not overborne in signing this agreement. Over one month had passed since the last act of physical violence. Neither the husband nor any other agent of the hospital voiced a threat of physical violence during that time. Gascho had plenty of time to consider the agreement, plenty of time to rescind the agreement after signature and plenty of time to consult a labor attorney, as one hospital executive (Greg Foy) recommended she do. She spoke with several people before she signed the agreement, including friends and trusted family members (*e.g.*, her children), and none of them advised her not to sign it. It is difficult to square these circumstances with the notion that Gascho's husband coerced her to sign the agreement. Gascho, indeed, offers not a single case or any other authority suggesting otherwise.

But this misses the point, Gascho insists, because she and her husband shared a fiduciary relationship owing from "their marital relationship." Gascho Br. at 14. "A threat," she adds, "is

- 12 -

improper if it is in breach of a duty of good faith and fair dealing such as exists between fiduciaries."

*Street*, 886 F.2d at 1482. But this again goes to show only that she may have had, or may still have,

compelling claims against her husband. Her husband, however, is no longer part of *this* case, and

she has not raised any complaints about the court's dismissal of him from the case or any other

limitations in suing *him*.

B.

Gascho independently argues that the district court jumped the gun in granting summary

judgment by failing to compel several of the hospital's witnesses to answer certain questions at their

depositions. We disagree.

In view of the threshold significance of the validity of the settlement agreement, the district

court "limited" the initial phase of discovery "to information regarding the enforceability of the

parties' settlement agreement, as well as its terms." R.14 at 2. During the depositions of five

witnesses, the hospital objected to several questions by Gascho's counsel and ultimately instructed

the witnesses not to answer these questions on the ground that they exceeded the scope of the

discovery order.

In response, Gascho moved to compel further depositions of these witnesses. In doing so,

however, she did not provide the district court with examples of the improper objections but instead

promised that "the transcripts at issue will be supplied so the Court can get a flavor for exactly what

went on." R.33 at 2. Yet she never came through on the promise, as she failed to produce the

transcripts to the court within the required time and did not even file a reply brief attempting to rebut the hospital's take on the dispute. Having no way to get a "flavor for exactly what went on," the district court denied the motion. R.38. The court reasoned that Gascho failed to explain how this discovery was "relevant to . . . her duress defense" and had not "explained . . . the nature of the discovery which she sought." R.38 at 4.

The court did not abuse its discretion in reaching this conclusion. It was Gascho's burden to provide a factual and legal premise for her motion—the questions asked and the context in which the deponents refused to answer—and she never did so.

Gascho cannot sidestep this conclusion on the ground that the district court initially scheduled a hearing, one at which she hoped to fill in these gaps, then cancelled it. The court's local rules reveal the peril of following this kind of strategy. "Oral hearings" on such motions, they said at the relevant time, "will be held unless the judge *at any time* prior to the hearing orders their submission and determination without oral hearing on the briefs filed as required by this rule." E.D. Mich. L.R. 7.1(e)(2) (approved Dec. 1, 2005), *available at* http://www.mied.uscourts.gov/Rules/RecentAmend/Docs/amendments_eff_110606.pdf (emphasis added). That a district court sets a hearing date on a motion, often it should be noted as a matter of course through the clerk's office, by no means amounts to an unbreakable commitment to the parties to hold the hearing, least of all when one of the parties has opted not to present anything worthy of argument.

Nor may Gascho sidestep this conclusion on the ground that an untimely reply brief included portions of the relevant depositions. District courts are entitled within reason to set their own schedules for filing briefs and introducing evidence, and a court's insistence on holding parties to these schedules generally does not amount to reversible error. No abuse of discretion occurred.

III

For these reasons, we affirm.