CLAY, Circuit Judge.
Plaintiff Jena McClellan brought suit against her former employer to enforce her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. , as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), and the Equal Pay Act, 29 U.S.C. § 206(d). The district court granted summary judgment for Defendant on the grounds that Plaintiff's federal claims were barred by *300 the common law tender-back doctrine. Because we conclude that the tender-back doctrine does not apply to claims brought under Title VII and the Equal Pay Act, we REVERSE the district court's judgment and REMAND for further proceedings.
BACKGROUND
Factual Background
In 2008, Defendant Midwest Machining, Inc., a maker of component parts for complex tools and machines, hired Plaintiff Jena McClellan as a telemarketer and quickly promoted her to work in their "inside sales" department. In late August of 2015, Plaintiff announced to her employer that she was pregnant. According to Plaintiff, her supervisor made negative comments for weeks in response to the announcement, including "commenting sardonically and jealously about her perfect life," (R. 1, Compl., PageID # 3), and was annoyed by Plaintiff's absences for pre-natal appointments. About three months later, Plaintiff was terminated "[d]espite [her] many years of service for the company in its inside sales department and no record of discipline in over six years." (R. 33, Second S. J. Order PageID # 230.)
Plaintiff testified that on the day of termination, Philip Allor, Midwest's president, called her into his office. There, he presented Plaintiff with an agreement and said that she "needed to sign then if [she] wanted any severance." (R. 17-3, McClellan Aff., PageID # 90.) As the district court explained, although the two reviewed the agreement together, "Allor did not ensure McClellan's understanding as they went along at a rapid pace." (R. 33, Second S. J. Order, PageID # 231 (citing R. 31-4, McClellan Dep., PageID # 202).) Plaintiff testified that she felt bullied throughout the meeting, that she felt she could not ask any further questions, and that Allor's tone was "raised" during the entire conversation. (R. 31-4, McClellan Dep., PageID # 203-04.) "[W]hen McClellan challenged a paragraph early on, and stated, 'I still should have had one week [of vacation] left,' Allor forcefully replied, '[you] do not,' and moved on." (R. 33, Second S. J. Order, PageID # 231 (citing R. 31-4, McClellan Dep., PageID # 202).) Plaintiff also testified that Allor shut the door and she did not feel free to leave.
"Feeling pressured," Plaintiff signed the agreement, without the benefit of a lawyer. (R. 17-3, McClellan Aff., PageID # 90.) The agreement provided that Plaintiff would waive "any and all past, current and future claims" she had against Midwest. (R. 16-1, Severance Agreement, PageID # 62.) Plaintiff would later affirm that she "did not understand that the 'claims' referred to in ... the severance agreement meant discrimination complaints." (R. 17-3, McClellan Aff., PageID # 90.) Instead, she "assumed it referred to any unpaid wages or benefits." (Id. )
Under the terms of the Severance Agreement, Defendant Midwest agreed to pay Plaintiff $4,000, payable in eight weekly installments beginning November 27, 2015. Defendant made each payment and Plaintiff accepted them.
Procedural History
Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, which issued her a right-to-sue letter on August 11, 2016. On November 6, 2016, Plaintiff met with an attorney and explained what had transpired during her employment with Midwest. Given that any Title VII claim was about to expire, Plaintiff's attorney "immediately drafted a lawsuit." (R. 17-2, Piper Aff., PageID # 83.)
On November 9, 2016, Plaintiff filed a complaint, naming Midwest Machining, *301 Inc. and Self Lube, Inc. as defendants. The complaint alleges that Midwest "terminated Ms. McClellan because of her pregnancy." (R. 1, Compl., PageID # 4.) It also accuses Midwest of maintaining a sex-segregated workforce insofar as "all 20 or so people who worked in inside sales ... were women," and "all three people who worked in outside sales were men." (Id. at PageID # 2.) The complaint further avers that Midwest "paid male outside sales persons substantially higher commissions and paid them substantially more overall than female inside sales persons, even though the positions required substantially similar duties, requirements, equal skill, effort and responsibility, under the same or similar working conditions." (Id. at PageID # 3.) The suit brought claims for "pregnancy discrimination" under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. , as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), under 42 U.S.C. § 1981a, and under the Michigan Elliot-Larsen Civil Rights Act, MCL 37.2101 et seq. (Count I); and for equal pay violations under the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d)et seq. , under the Michigan Minimum Wage Law of 1964, MCL 408.381 et seq. (repealed 2014), and under the Elliot-Larsen Act (Count II).
After receiving Plaintiff's complaint, Midwest's counsel informed Plaintiff's counsel of the severance agreement. On or around December 1, 2016, about three weeks after Plaintiff filed suit and before any responsive pleading was due, Plaintiff sent a letter to Midwest, at the direction of her attorney, saying that she was "rescinding the severance agreement ... because [she] want[ed] to litigate matters relating to [her] former employment and termination." (R. 17-2, McClellan Letter, PageID # 85; R. 17-2, Piper Aff., PageID # 83.) Enclosed with the letter was a check for $4,000. Midwest responded by returning the check to Plaintiff a week later, asserting that "[t]here is no legal basis for rescinding the severance agreement." (R. 17-2, Midwest Resp., PageID # 87.)
On February 24, 2016, Defendants filed a motion for summary judgment, arguing that the severance agreement barred Plaintiff's claims. They further argued that Plaintiff's claims were also barred because she did not "tender back" the monetary consideration she received under the severance agreement before commencing her lawsuit. On April 18, 2017, the district court granted in part and denied in part Defendants' motion for summary judgment. The court dismissed Defendant Self Lube, Inc., holding that there was no such legal entity known as Self Lube, which instead is a valid assumed name for Midwest Machining, Inc. The court then denied summary judgment for Defendant Midwest without prejudice and held that "at this stage and on this factual record, the Court cannot conclude the release was valid under federal law." (R. 19, First S. J. Order, PageID # 101.) The court permitted the parties to conduct discovery limited to the issue of whether Plaintiff "knowingly and voluntarily executed the agreement." (Id. at PageID # 102-04.) The court also ordered further briefing as to whether federal law required a plaintiff to tender back any consideration received under a severance agreement before commencing suit under Title VII and the EPA.
On May 30, 2017, Defendant Midwest Machining, Inc. filed a renewed motion for summary judgment. And on August 3, 2017, the court granted it. The court held that genuine disputes of material fact precluded summary judgment on the issue of whether Plaintiff "knowingly" and "voluntarily" executed the severance agreement. Indeed, the court found that on the morning *302 Plaintiff signed the agreement, "she was 'blindsided' by an unexpected meeting" to terminate her employment; "she felt 'bullied,' did not feel free to leave the room, and did not feel like she could ask any questions." (R. 33, Second S. J. Order, PageID # 232.) Further, Philip Allor had "insisted [Plaintiff] sign the agreement and forcefully said if she wanted any money after her abrupt termination, she would need to sign the agreement; she had no time to consider whether to sign the release, and certainly no time to consult with a lawyer." (Id. ) The court added that Plaintiff "received a small sum of money to extinguish any claims if she truly suffered unlawful discrimination" and found that "she did not understand the broad scope of the agreement." (Id. ) Based on these facts, the district court concluded that a jury could find that Plaintiff did not enter into the agreement knowingly and voluntarily.
Nonetheless, the district court granted summary judgment for Midwest based on "the common-law doctrines of release and tender back." (Id. at PageID # 229.) The court held that, even if a severance agreement is voidable on grounds of duress or involuntariness, a plaintiff will still ratify the contract unless she "return[s] the consideration" as a precondition to filing suit, (id. at PageID # 233), and Plaintiff "did not 'tender back' [the consideration] prior to filing suit." (Id. at PageID # 232.) The court did not mention that Plaintiff had offered to tender back the money shortly after filing suit. The court declined to exercise supplement jurisdiction over her state law claims.
Plaintiff subsequently filed a timely notice of appeal.
DISCUSSION
I. Standard of Review
We review a district court's grant of summary judgment de novo. Maben v. Thelen , 887 F.3d 252, 263 (6th Cir.2018). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that no genuine issues of material fact exist. Celotex Corp. v. Catrett , 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party must demonstrate the "basis for its motion, and identify[ ] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Id . at 323, 106 S.Ct. 2548 (internal citations and quotation marks omitted). The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations and quotation marks omitted). The reviewing court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id . at 251-52, 106 S.Ct. 2505. A court should view the facts and draw all reasonable inferences in favor of the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
II. Analysis
A. The common law tender-back doctrine does not apply to claims brought under Title VII or the Equal Pay Act.
"Federal law controls the validity of a release of a federal cause of action."
*303 Street v. J.C. Bradford & Co. , 886 F.2d 1472, 1481 (6th Cir.1989) ; accord Gascho v. Scheurer Hosp. , 400 F. App'x 978, 981 (6th Cir.2010). And when evaluating a plaintiff's challenge to the validity of a release, courts must "remain[ ] alert to ensure that employers do not defeat the policies of ... Title VII by taking advantage of their superior bargaining position or by overreaching." Adams v. Philip Morris, Inc. , 67 F.3d 580, 583 (6th Cir.1995).
The district court dismissed Plaintiff's Title VII and EPA claims on the ground that she did not "tender back" the $4,000 she received under the severance agreement prior to filing her lawsuit. The court held that, under the tender-back doctrine, "even if a party signs a release under duress, she must 'as a condition precedent to suit, ... return the consideration in exchange for a release.' " (R. 33, Second S. J. Order, PageID # 233 (quoting Oubre v. Entergy Operations, Inc. , 522 U.S. 422, 436, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998) (Thomas, J., dissenting).) )
This "tender-back doctrine" is rooted in "general principles of state contract jurisprudence." Oubre , 522 U.S. at 425, 118 S.Ct. 838. The doctrine provides that "contracts tainted by mistake, duress, or even fraud are voidable at the option of the innocent party," but "before the innocent party can elect avoidance, she must first tender back any benefits received under the contract." Id. (citations omitted). "If she fails to do so within a reasonable time after learning of her rights ... she ratifies the contract and so makes it binding." Id. (citations omitted). At the heart of this appeal is whether the tender-back doctrine applies to claims brought under Title VII and the EPA, a question of first impression in this Circuit. We now hold that a plaintiff is not required to tender back consideration received under a severance agreement before bringing claims for violations of Title VII or the EPA.
In a number of unpublished opinions, we have discussed the application of the tender-back doctrine to other federal statutes. For instance, in Samms v. Quanex Corp. , 99 F.3d 1139 (6th Cir.1996) (unpublished table decision), this Court endorsed the tender-back doctrine in the context of a claim brought under the Employee Retirement Income Security Act ("ERISA"), where the plaintiff had not tendered back money received in exchange for signing a release before filing suit. We recognized, however, that "[t]here are times when, as a matter of public policy, courts have refused to apply the tender back doctrine." Id. at *3. Then, in Bittinger v. Tecumseh Prods. Co. , the Eastern District of Michigan held that tender back was a "prerequisite to plaintiff's maintenance of a claim challenging the validity of a release in a non-ADEA context." 83 F.Supp.2d 851, 871 (E.D. Mich. 1998). We adopted that opinion without commentary. Bittinger v. Tecumseh Prods. Co. , 201 F.3d 440 (6th Cir.1999) (unpublished table decision). Next, in Halvorson v. Boy Scouts of Am. , 215 F.3d 1326 (6th Cir.2000) (unpublished table decision), this Court affirmed the granting of summary judgment for the defendant on the grounds that the plaintiff released the defendant from claims brought under the ADA, the FMLA, and ERISA, and subsequently ratified that release by retaining the severance money. The Court did not explicitly address the tender-back rule.
The only published decision from this Court identified by the parties that discusses the tender-back doctrine in the context of a release of federal claims is Raczak v. Ameritech Corp. , 103 F.3d 1257 (6th Cir.1997). In Raczak , Judge Jones rendered the opinion of the Court on the tender-back issue, writing that he "[did] not believe Plaintiffs are required to tender back the consideration they received as a precondition to bringing suit against *304 the Defendants under the Age Discrimination in Employment Act." Id. at 1268-69. Judge Jones reasoned as follows:
[T]o require Plaintiffs to tender back benefits would be inequitable. A tender-back requirement would deter meritorious ADEA filings. Potential Plaintiffs would be faced with the Hobsonian choice of releasing their claims and receiving payments immediately or filing an age discrimination claim that would likely take years to resolve. It is doubtful that few claimants would choose the latter. If Plaintiffs had already received release consideration they would have to recover any amounts spent before they could bring a claim. This would bar Plaintiffs from litigating their age discrimination claims in court. Rather than a bar to suit, a release should be considered as a factor that would reduce the judgment amount received by a plaintiff upon bringing suit.
Id. In reaching this conclusion, Judge Jones relied on the Supreme Court's decision in Hogue v. Southern R.R. Co. , 390 U.S. 516, 88 S.Ct. 1150, 20 L.Ed.2d 73 (1968).
In Hogue , the Supreme Court held that a plaintiff was not required to tender back payments received prior to bringing suit under the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51 et seq. The district court in the instant case distinguished Hogue as relying on a provision in the FELA that "seemingly supplanted common law." (R. 33, Second S. J. Order, PageID # 235.) That provision states that "[a]ny contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void[.]" 45 U.S.C. § 55. But the Court in Hogue explicitly disclaimed reliance on this provision. See 390 U.S. at 518, 88 S.Ct. 1150 ("There is no occasion to decide whether the release here involved violated [42 U.S.C. § 55]."). Instead, the Court held that it was "sufficient for the purposes of [its] decision to note that a rule which required a refund as a prerequisite to institution of suit would be 'wholly incongruous with the general policy of the Act to give railroad employees a right to recover just compensation for injuries negligently inflicted by their employers.' " Id. (quoting Dice v. Akron, C. & Y.R. Co. , 342 U.S. 359, 362, 72 S.Ct. 312, 96 L.Ed. 398 (1952) ). Defendant distinguishes Hogue on the grounds that "[t]he Supreme Court could easily have relied on Section [55] of the FELA." (Brief for Appellee at 16.) Significantly, however, it did not.
In Raczak , Judge Jones held that " Hogue may be extended logically to ADEA claims" as "[b]oth statutes are designed to make employees whole again from injuries received, whether physical or emotional, during the course of employment." Id . at 1270. Notably, he too did not rely on any particular provision of the ADEA in reaching his conclusion.
Just one year later, the Supreme Court would bear out Judge Jones' reasoning in Raczak , marking the second time that the Supreme Court has disavowed the tender-back rule in the context of remedial employment statutes. In Oubre , the plaintiff signed a release as part of a termination agreement from her position with Entergy that purported to discharge Entergy from any claims arising from her employment. 522 U.S. at 422, 118 S.Ct. 838. Oubre later brought an age discrimination claim under the ADEA, and Entergy asserted that the claim was barred by the release. The release, however, did not comply with a provision in the ADEA (created by the Old Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f)(1) ) that prescribes standards that must be followed *305 for a release of claims to be valid. Entergy admitted the release was defective, but argued that the doctrines of tender-back and ratification still barred Oubre's suit. The Court disagreed, holding that because the agreement did not conform to the OWBPA, which "sets up its own regime for assessing the effect of ADEA waivers, separate and apart from contract law," the employer had no defense based on the plaintiff's failure to tender back the severance money, "notwithstanding how general contract principles would apply to non-ADEA claims." Id. at 427, 118 S.Ct. 838.
Although this conclusion was specific to the OWBPA and the ADEA, it offers some guidance for other cases involving federal remedial statutes. First, the Court rejected the employer's claim that the general rule in contract law is that a plaintiff must tender back benefits received under a contract before bringing suit. Id. at 426, 118 S.Ct. 838. The Court highlighted cases to the contrary and noted that in equity "a person suing to rescind a contract, as a rule, is not required to restore the consideration at the very outset of the litigation." Id. (internal citations omitted). Further, the Court explained that applying the tender-back doctrine to ADEA lawsuits "would frustrate the statute's practical operation...." Id. at 427, 118 S.Ct. 838. Justice Kennedy, writing for the Court, explained as follows:
In many instances a discharged employee likely will have spent the moneys received and will lack the means to tender their return. These realities might tempt employers to risk noncompliance with the OWBPA's waiver provisions, knowing it will be difficult to repay the moneys and relying on ratification. We ought not to open the door to an evasion of the statute by this device.
Id.
Evidently, the Supreme Court was motivated in part by the remedial goals of the statute. And as Amicus , Equal Employment Opportunity Commission, points out, "[t]he same policy concerns apply with equal if not greater force here. If the district court's decision is affirmed, employers within this Circuit will have every incentive to pressure employees into executing waivers under duress, or even engage in deceptive practices to induce them to do so, knowing that it will be difficult for those employees, especially lower-paid ones, to tender back the consideration and rescind the agreement." (Brief for Amicus Curiae at 12.)
Courts have applied Oubre and Hogue to bar tender prerequisites in lawsuits involving other federal statutes. See Botefur v. City of Eagle Point , 7 F.3d 152, 156 (9th Cir.1993) (recognizing that "the rule announced in Hogue , that tender back is not required for suit under the FELA, is generalizable to suits under other federal compensatory statutes" and finding no tender back requirement for § 1983 plaintiff); Smith v. Pinell , 597 F.2d 994, 996 (5th Cir.1979) (same for Jones Act plaintiff). In Long v. Sears Roebuck & Co. , which was a pre- Oubre decision, the Third Circuit considered tender back and ratification in the context of the ADEA. 105 F.3d 1529 (3d Cir.1997). Although part of the court's discussion was based on the OWBPA, the court also addressed more general issues and looked to Hogue for guidance, concluding that "courts have regularly applied the analysis in Hogue to reject tender requirements in lawsuits brought under a variety of federal remedial statutes." Id. at 1541.
The Third Circuit explained that the ADEA was clearly a "federal remedial statute," and, because the purpose of the ADEA was to provide redress for discrimination, the court held that the tender-back rule should be rejected in suits under the ADEA, just as it was for suits under the *306 Federal Employers Liability Act. The court explained that "[t]he mandate of Hogue is that tender back requirements imposed in connection with the release of federal rights be evaluated in light of the general policy of the statute in question." Id. at 1541 n.22. Further, the court identified the challenge involved in calculating the proper amount for tender back:
A tender requirement in such cases would ... create a conundrum as to how much [consideration] should be tendered to restore the pre-release status quo. There is no available method of forcing the parties to agree on what an appropriate amount would be, since typically the employer does not specify how much of the consideration paid to the employee is for the retirement and how much is for the release.
Id. at 1543-44 (quoting Isaacs v. Caterpillar, Inc. , 765 F.Supp. 1359, 1368 (C.D. Ill. 1991) ) (alteration in Long ). The court reasoned that this confusion as to the amount of consideration to be returned would require "an employee to return a sum that typically incorporates consideration for multiple factors not challenged in an age case: waivers for other violation of law or contract, rolled-in vacation and sick time, and a public relations benefit to the employer that itself may deter other litigation." Id. at 1544. Thus, the court determined that it would best serve the purposes of the ADEA to reject the tender requirement in such cases.
Later, the Third Circuit cited Oubre to reaffirm the approach it took in Long and extended Hogue to claims brought under ERISA. See Jakimas v. Hoffmann-La Roche, Inc. , 485 F.3d 770 (3d Cir.2007). The court explained that "ERISA, like the ADEA and the FELA, is a 'federal remedial statute.' It was 'designed to promote the interests of employees and their beneficiaries in employee benefit plans.' " Id. at 784 (quoting Dewitt v. Penn-Del Directory Corp., 106 F.3d 514, 520 (3d Cir.1997) ). Further, "[t]he same deterrence concerns exist in this context as well. A plaintiff should not be deterred from bringing a meritorious claim." Id. "Additionally, as the Court explained in Oubre the application of the doctrine of ratification to ERISA claims may frustrate the practical operation of the protections ERISA affords. It is likely that many employees discharged in violation of § 510 may have spent the moneys they received as severance pay. Employers could risk noncompliance with the requirement that a release must be made knowingly and voluntarily and simply rely on ratification." Id.
Returning to the instant case, the reasoning in Hogue and Oubre is clearly relevant to claims brought under Title VII and the EPA. The Supreme Court has recognized that the ADEA (the statute at issue in Oubre ) and Title VII "share common substantive features and also a common purpose: 'the elimination of discrimination in the workplace.' " McKennon v. Nashville Banner Publ'g Co. , 513 U.S. 352, 358, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995) (quoting Oscar Mayer & Co. v. Evans , 441 U.S. 750, 756, 99 S.Ct. 2066, 60 L.Ed.2d 609 (1979) ). The Court explained as follows:
Congress designed the remedial measures in these statutes to serve as a "spur or catalyst" to cause employers "to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges" of discrimination. Albemarle Paper Co. v. Moody, 422 U.S. 405, 417-418 [95 S.Ct. 2362, 45 L.Ed.2d 280] (1975) (internal quotation marks and citation omitted); see also Franks v. Bowman Transp. Co., 424 U.S. 747, 763 [96 S.Ct. 1251, 47 L.Ed.2d 444] (1976). Deterrence is one object of these statutes.
*307 Compensation for injuries caused by the prohibited discrimination is another. Albemarle Paper Co. v. Moody, supra, at 418, 95 S.Ct. at 2372 ; Franks v. Bowman Transp. Co., supra, at 763-64 [96 S.Ct. 1251]. The ADEA, in keeping with these purposes, contains a vital element found in both Title VII and the Fair Labor Standards Act: It grants an injured employee a right of action to obtain the authorized relief. 29 U.S.C. § 626(c). The private litigant who seeks redress for his or her injuries vindicates both the deterrence and the compensation objectives of the ADEA. See Alexander v. Gardner-Denver Co., 415 U.S. 36, 45 [94 S.Ct. 1011, 39 L.Ed.2d 147] (1974) ("[T]he private litigant [in Title VII] not only redresses his own injury but also vindicates the important congressional policy against discriminatory employment practices"); see also Teamsters v. United States, 431 U.S. 324, 364, 97 S.Ct. 1843, 1869, 52 L.Ed.2d 396 (1977).
Id. Similarly, the Supreme Court has explained that "[t]he Equal Pay Act is broadly remedial, and it should be construed and applied so as to fulfill the underlying purposes which Congress sought to achieve." Corning Glass Works v. Brennan , 417 U.S. 188, 208, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974).
Like the ADEA, Congress designed Title VII so that the enforcement of its substantive measures against employers would be effected, at least in substantial part, through private individuals asserting a claim. "In such cases, the private litigant not only redresses his own injury but also vindicates the important congressional policy against discriminatory employment practices." Alexander v. Gardner-Denver Co. , 415 U.S. 36, 45, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). And the Court recognized that imposing a tender-back rule in the ADEA context would undermine this feature of the statute insofar as "[i]n many instances a discharged employee likely will have spent the moneys received and will lack the means to tender their return," thereby tempting employers to "risk noncompliance ... knowing it will be difficult to repay the moneys and relying on ratification." Oubre , 522 U.S. at 427, 118 S.Ct. 838. The same could be said in the Title VII and EPA contexts, which confront the same economic realities; indeed, employees discharged following instances of sex discrimination (and especially those fired because they are pregnant) are just as likely to need their severance funds for living expenses as are employees discharged following any other form of discrimination.
Only the Eighth Circuit has a published, post- Oubre case that explicitly discusses the application of the tender-back rule to Title VII claims. See Richardson v. Sugg , 448 F.3d 1046, 1057 (8th Cir.2006) (applying Oubre 's policy considerations to a prospective Title VII waiver and finding "that the doctrines of tender-back and ratification do not bar [Plaintiff's] suit."). As for district courts, some have followed Hogue and Oubre to find that the tender-back doctrine does not create a prerequisite to filing suits under Title VII. For instance, a district court in New Mexico explicitly applied Oubre to a Title VII case, holding that:
[a]n inflexible application of the tender back rule would, as a practical matter, prevent courts from determining the conditions under which a release has been obtained. Plaintiffs with meritorious suits effectively would be precluded from bringing their claims. As emphasized in Hogue , supra , this would be contrary to Congress' purposes in passing statutes such as the FELA, ADEA, or Title VII.
*308 Rangel v. El Paso Nat. Gas Co. , 996 F.Supp. 1093, 1097 (D.N.M. 1998) (collecting cases). Some district courts in our circuit, however, have instead chosen to extend our Court's decisions in Bittinger and Samms and have required tender back in Title VII cases. See, e.g. , Larkins v. Reg'l Elite Airline Servs., LLC , No. 1:12cv139, 2013 WL 1818528, at *6 (S.D. Ohio Apr. 29, 2013) ; Williams v. Detroit Pub. Sch. , No. 10-10856, 2011 WL 6945729, at *7 (E.D. Mich. Dec. 6, 2011).
Defendant relies on Fleming v. United States Postal Serv. AMF O'Hare , 27 F.3d 259 (7th Cir.1994), a pre- Oubre case, which held that the plaintiff in a Title VII case had to tender back payments received under a severance agreement with the postal service before she could bring an employment suit. The court decided that, since Title VII does not statutorily regulate releases (unlike the FELA, the Jones Act, and the ADEA), ordinary contract rules of tender back and ratification apply. See id. at 262 ("This is a garden-variety rescission case requiring tender back of consideration received."). In reaching this conclusion, the court relied on a "free-market" contract law analysis: "[A] premise of a free-market system is that both sides of the market, buyers as well as sellers, tend to gain from freedom of contract." Id. at 261. However, as the Eighth Circuit recognized, Fleming "was decided without the aid of Oubre 's policy underpinnings to the effect that releases of claims under remedial statutes like the ADEA and Title VII frustrate the purposes of those statutes." Richardson , 448 F.3d at 1057. Indeed, the language in Oubre and its emphasis on the economic realities of the recently-discharged cast serious doubt on the Seventh Circuit's approach. "Title VII was created precisely to combat a deficiency in the market, namely inappropriate discrimination, which had the effect of placing parties in unequal bargaining positions." Rangel , 996 F.Supp. at 1097. Thus, "[i]t would appear contrary to Congressional intent to apply a free market approach in interpreting a statute aimed at fighting the market deficiency of improper discrimination." Id. at 1098.
In sum, we conclude that the language and reasoning of Oubre and Hogue apply equally to claims brought under Title VII and the EPA. In Oubre , the Supreme Court was worried about "tempt[ing] employers to risk noncompliance ... knowing it will be difficult to repay the moneys and rely[ ] on ratification." 522 U.S. at 427, 118 S.Ct. 838. Similarly, we worry that requiring recently-discharged employees to return their severance before they can bring claims under Title VII and the EPA would serve only to protect malfeasant employers at the expense of employees' statutory protections at the very time that those employees are most economically vulnerable. We therefore hold that the tender-back doctrine does not apply to claims brought under Title VII and the EPA. Rather, as the Supreme Court said in Hogue , "it is more consistent with the objectives of the Act to hold ... that ... the sum paid shall be deducted from any award determined to be due to the injured employee." 390 U.S. at 518, 88 S.Ct. 1150.[1]
*309 B. Plaintiff effectively tendered back the consideration prior to bringing suit.
Assuming arguendo that Plaintiff were required to tender back in order to file her claims under Title VII and the EPA, the district court still erred by granting summary judgment for Defendant. The record is undisputed that upon Plaintiff's counsel learning that the parties *310 had entered into a severance agreement, Plaintiff sent a check to Defendant for the full amount she received. Instead of accepting the check, however, Defendant returned it a week later, baldly asserting that "[t]here is no legal basis for rescinding the severance agreement." (R. 17-2, Midwest Resp., PageID # 87.)
For the district court, the timing of the return attempt was the deciding factor. The court held that Plaintiff could not pursue her federal claims because she did not tender back the consideration "prior to filing suit."[2] (R. 33, Second S. J. Order, PageID # 232.) But "[e]ven assuming that federal law requires that Plaintiff tender back the consideration that she received under the release, federal law does not require that the tender back be before, or contemporaneous with, the filing of the original complaint." Gascho v. Scheurer Hosp. , 589 F.Supp.2d 884, 891 (E.D. Mich. 2008). In reaching the alternative conclusion, the district court erroneously relied on Michigan law and Justice Thomas' dissent in Oubre , where he wrote that a party seeking to void a release must "as a condition precedent to suit, ... return the consideration received in exchange for a release." Oubre , 522 U.S. at 436, 118 S.Ct. 838 (Thomas, J., dissenting) (citing Buffum v. Peter Barceloux Co. , 289 U.S. 227, 234, 53 S.Ct. 539, 77 L.Ed. 1140 (1933) ). The Oubre majority, however, held that the party "elect[ing] avoidance" may tender back any benefits received under the severance agreement not only before filing suit, but at any point "within a reasonable time after learning of her rights ." 522 U.S. at 425, 118 S.Ct. 838 (emphasis added). This comports with the Restatement of Contracts, which provides that "[t]he power of a party to avoid a contract for ... duress ... is lost if, after the circumstances that made it voidable have ceased to exist, he does not within a reasonable time manifest to the other party his intention to avoid it." Restatement (Second) of Contracts § 381(1) (1981) (emphasis added).
Accordingly, even if Plaintiff were required to tender back the consideration, she was required to do so not before filing suit but within a "reasonable time" after she discovered that the severance agreement revoked her right to bring a discrimination claim. And given the district court's factual finding that Plaintiff "did not understand she had given up her right to sue for discrimination" until engaging counsel to represent her in this matter, (R. 33, Second S. J. Order, PageID # 231), and that her counsel drafted a complaint immediately after speaking with her, it stands to reason that Plaintiff's offer to tender back the consideration fell "within a reasonable time after learning of her rights," Oubre , 522 U.S. at 425, 118 S.Ct. 838.
In sum, even if we were to hold that plaintiffs are required to tender back consideration prior to bringing claims under Title VII and the EPA, the plaintiff in this case effectively did so.
CONCLUSION
For the reasons set forth above, we REVERSE the district court's decision and REMAND for further proceedings consistent with this opinion.
*311 CONCURRING IN PART AND DISSENTING IN PART

The dissent ignores the peculiarities of Title VII and claims brought under other federal remedial statutes and would treat them no differently than any other claims. Indeed, the dissent cites to numerous state commercial cases to explain how the tender-back doctrine should apply to the instant case and even admonishes the majority that "there is no federal general common law." (internal quotation marks, alteration, and citation omitted). But of course, the dissent also acknowledges that "[b]oth the Supreme Court and the Sixth Circuit have broadly stated that federal law governs the validity of an agreement to release a federal cause of action." Contrary to the dissent, the issues presented by this case require us to look to federal law, not to state law.
The dissent's refusal to look away from state law helps explain the confusion in its preferred approach to the tender-back doctrine. After presenting a largely superfluous history lesson on the doctrine's application in courts of law and courts of equity, the dissent suggests that "[t]o decide which version of the rule to apply courts should consider the requested remedy." If the requested remedy is damages, then, the dissent argues, the rule should be strict and it should require the return of consideration before initiating suit; if, however, the remedy requested is an equitable one, then the rule should be more flexible, asking whether the plaintiff returned the consideration within a reasonable time. Thus, the dissent would remand this case to the district court to analyze the remedies Plaintiff seeks and determine which rule to apply. This approach does not make sense in the context of a claim brought under Title VII.
Remedies under Title VII are different than remedies for violations of state commercial law. As the Supreme Court has highlighted, the Congressional Record regarding Title VII makes clear that:
[t]he [remedy provisions of Title VII] are intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible . In dealing with the present section 706(g) the courts have stressed that the scope of relief under that section of the Act is intended to make the victims of unlawful discrimination whole, and that the attainment of this objective rests not only upon the elimination of the particular unlawful employment practice complained of, but also requires that persons aggrieved by the consequences and effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination.
Albemarle Paper Co. , 422 U.S. at 421, 95 S.Ct. 2362 (emphasis added) (quoting 118 Cong. Rec. 7168 (1972) ). Thus, Title VII remedies aim "to make the victims of unlawful discrimination whole by restoring them, so far as possible ... to a position where they would have been were it not for the unlawful discrimination." Ford Motor Co. v. E.E.O.C. , 458 U.S. 219, 230, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982) (internal quotation marks and alterations omitted) (quoting Albemarle Paper Co. , 422 U.S. at 421, 95 S.Ct. 2362 ). And "[w]here a court finds that invidious discrimination has taken place in violation of Title VII, the district court has broad discretion to fashion remedies to make the victims whole[.]" Oakley v. City of Memphis , 566 F. App'x 425, 429 (6th Cir.2014). Further, "[t]he [Title VII] scheme implicitly recognizes that there may be cases calling for one remedy but not another, and ... these choices are, of course, left in the first instance to the district courts." Albemarle Paper , 422 U.S. at 415-16, 95 S.Ct. 2362.
As this Court has explained, "Congress' purpose in vesting a variety of 'discretionary' powers in the courts was ... to make possible the 'fashion(ing) (of) the most complete relief possible.' " Isabel v. City of Memphis , 404 F.3d 404, 414 (6th Cir.2005) (quoting Albemarle , 422 U.S. at 425, 95 S.Ct. 2362 ) (alteration in Albemarle ). That a party requests a particular form of relief does not decide the appropriate relief in a Title VII case. See Selgas v. American Airlines, Inc. , 104 F.3d 9, 13 n.2 (1st Cir.1997) ("It is clear that in a Title VII case, it is the court which has discretion to fashion relief comprised of the equitable remedies it sees as appropriate, and not the parties which may determine which equitable remedies are available."). And it should be clear that the district court cannot predict what relief will be appropriate for a case before discovery has completed and before the type and scope of the injury have been established at trial. In short, the dissent's preferred approach-i.e. , to have the district court decide at the outset the appropriate form of relief and then use that to decide how to apply the tender-back rule-does not make sense in the context of a Title VII case: a district court simply will not know how or what relief to fashion at the outset of the case.

It is worth noting that Fleming faulted the plaintiff's attorney for not asking the court of appeals to remand the case so that the plaintiff could offer to tender back the funds, 27 F.3d at 262 -the clear implication being that, even under Fleming 's framework, Plaintiff would be allowed to proceed with her suit, given that she did offer to return the consideration.